(3 App. Div. 395.)

## GORDON v. STRONG et al.

(Supreme Court, Appellate Division, Second Department. April 28, 1896.)

1. BRIDGE COMMISSIONERS,—CONTRACTS—POWERS.

Laws 1895, c. 789, § 5, provides for the appointment of commissioners to build a bridge between the cities of Brooklyn and New York, and authorized them to purchase the powers and rights of any corporation having a charter to construct such a bridge in so far as they conflicted with the location of their bridge, and to contract with any corporation to operate a railroad across the bridge. *Held*, that the commissioners, in the purchase of the rights of a bridge company, the location of whose bridge interfered with the location selected by the commissioners, could agree to construct their bridge with tracks for the exclusive use of elevated railroads.

2. SAME—CONSTRUCTION.

In such a case, that the bridge company whose rights were purchased was authorized to consolidate with elevated railroad companies does not make the provision in the contract of purchase, requiring the bridge to be constructed with tracks for the use of elevated railroads, one granting the exclusive use of the tracks to the bridge company.

3. SAME—PURCHASE OF FRANCHISE OF BRIDGE COMPANY.

Where the charter of the bridge company authorized it to construct two bridges, which were required to connect at a certain point, the location of one bridge sufficiently locates the second bridge as to authorize the commissioners, in the purchase of the bridge company's rights, to include the franchise for the construction of both bridges.

Appeal from special term, Kings county.

Action by William Gordon against William L. Strong and others for an injunction. From a judgment (38 N. Y. Supp. 449) for plaintiff, defendants appeal. Reversed.

Argued before BROWN, P. J., and PRATT, CULLEN, BARTLETT, and HATCH, JJ.

William G. Choate and Henry C. M. Ingraham, for appellant commissioners.

G. W. Wingate, for appellant East River Bridge Co.

Francis R. Whitney, for respondent.

BROWN, P. J. This action was brought by the plaintiff, as a taxpayer of the city of Brooklyn, against the mayors and comptrollers, respectively, of the city of Brooklyn and the city of New York, the commissioners appointed under and pursuant to chapter 789, Laws 1895, for the purpose of the construction of a bridge over the East river between the said cities, the East River Bridge Company, and the Brooklyn Elevated Railroad Company. The object

of the action is to obtain a judgment annulling a certain contract whereby said commissioners agreed to purchase the franchise possessed by said bridge company to construct a bridge across said river from a point at or near Broadway in the city of Brooklyn to a point between Delancy and Rivington streets in the city of New York, and to restrain said commissioners from carrying out said contract. The order appealed from restrains the carrying out of said contract, but grants leave to the commissioners to apply to the court to have the injunction vacated whenever they cause to be stricken from said contract—

(1) The provision therein contained, which is as follows:

"It is also expressly understood and agreed between the parties aforesaid that the bridge to be constructed by the parties of the second part [the commissioners of the two cities] across the East river under and in pursuance of chapter 789 of the Laws of 1895 shall, among other features, contain the following: Space for two separate and independent railroad tracks for the use exclusively of elevated railroads, with gradients to be determined by the party of the second part or their successors to be practicable and consistent with the motive power which shall be in use by such railroads at the time said bridge be completed, and that said bridge shall have suitable and ample terminal facilities for such railroads, which facilities need not, however, extend beyond the approaches of the bridge as the same shall be laid out and established by the parties of the second part."

(2) When such agreement shall be modified so that it will appear therefrom that the part of the consideration agreed to be paid, which was based upon the purchase of the right to go on the space reserved for a second bridge which said company was authorized to construct, has been ascertained, and abated and deducted from the consideration named in the contract.

To a proper understanding of the second condition upon which said commissioners were permitted to apply to the court to have said order vacated it is necessary to state that said bridge company was incorporated by chapter 101 of the Laws of 1892, and by said act was required, under the conditions and within the time therein stated, to construct, maintain, and operate a bridge between the points above named, and was also authorized and empowered to construct, maintain, and operate a second bridge between said cities, commencing at a point within the pier line of the East river and Fulton street in the city of Brooklyn and between Bridge street on the west and Little street on the east in said city, and then extending as nearly northwardly as possible to a point between Jackson and Scammel streets in the city of New York; thence northwestwardly to Grand street; thence across Grand street to a point between Delancy and Rivington streets, in junction with the line of the first bridge. For convenience of reference, these two bridges may be designated as "Bridge No. 1" and "Bridge No. 2." By the contract which the plaintiff seeks to have annulled the commissioners agreed to purchase, and said company agreed to sell and convey to said commissioners for the sum of $200,000, the franchises and all the rights and powers of the bridge company so far as the same related to bridge No. 1, and any and all existing rights of said company to operate a railroad across said bridge, and also all rights

and powers of said company to construct bridge No. 2, or its approaches or appurtenances, north of the house line on the north side of Grand street in the city of New York; the said company agreeing not to construct any part of its bridge No. 2, or the approaches or appurtenances thereto, north of the southerly line that should be established as the southerly line of the bridge to be constructed by the commissioners. By the act under which the said commissioners were appointed they were directed as soon as possible to prepare and adopt such a plan of a permanent suspension bridge from at or near the foot of Broadway in the city of Brooklyn to at or near the foot of Grand street in the city of New York as to them should seem best to carry out the provisions of the act authorizing their appointment, and upon the adoption of said plans were directed to proceed to construct said bridge and the approaches and appurtenances thereto. They were given full and ample power to carry out the provisions of the law by entering into contracts, acquiring title to the necessary land and land under water by purchase or condemnation, and to take possession thereof in the joint names of the two cities; and ample provision was made in said act for the issue of bonds of said cities to raise the money to meet the expenses so authorized. By section 5 of said act it was provided as follows:

"Sec. 5. If any corporation shall possess a valid charter, with authority to construct a bridge such as is contemplated by the provisions of this act, said commissioners may, if they so determine, with the express consent of the mayors and comptrollers of the respective cities, purchase said charter and all the rights and powers granted thereby from the corporation so holding the same, so far as the same relates to the bridge authorized by this act, at a price to be mutually agreed upon, and thereby to take or extinguish any existing right of such corporation to operate any railroad across said bridge. And any such corporation is hereby authorized to sell the same at such a price as its directors may by a vote of a majority of them assent to, and upon such purchase said cities shall be vested with all the rights, powers and privileges of said corporation."

Under and pursuant to the power delegated in this section of the act the contract in question was entered into.

The plaintiff seeks to have this contract annulled on the grounds (1) that it is illegal; (2) that it was entered into fraudulently, and with the intent on the part of said commissioners and said bridge company to defraud the cities of New York and Brooklyn out of large sums of money and important and valuable rights and franchises; (3) that it constituted a waste of the public funds of said cities, in that an exclusive right was therein granted to the Brooklyn Elevated Railroad Company to use and operate a double line of railroad tracks upon said bridge, together with terminal facilities and grade connections; and also in that the franchise and rights possessed by the bridge company, and which it agreed to transfer and convey to the commissioners, were worthless, and of no value. These allegations will be considered in the order named.

(1) The legality of the purchase of the charter of the bridge company and all the rights and powers which that company possessed to construct and operate a bridge across the East river is not open to question. The power to purchase that charter by the commission-

ers, and the authority to sell the same by the bridge company, is specifically delegated in the fifth section of the act, which I have quoted. The only limitation placed upon the exercise of the power to purchase is that the property and rights purchased shall relate to the bridge to be constructed by the commissioners, and that the purchase shall have the express consent of the mayors and comptrollers of the respective cities. Both of these conditions are complied with in the contract entered into. Neither is there any question as to the legality of the clause in the contract in reference to the construction of "two separate and independent railroad tracks for the use exclusively of elevated railroads," treating this question solely as one of the power of the commission to contract. The learned judge who heard the case at special term treated this clause as one granting the use of the tracks exclusively to elevated railroads owned or to be owned or controlled by the bridge company, or in which it might have an interest. That the bridge company has the power to consolidate with a corporation operating an elevated railroad, and may thus acquire ownership or control in such a corporation, may be admitted. But the clause of the contract does not purport to grant the use of the tracks to any corporation. There is no more justification in saying that this provision favors the Brooklyn Elevated Railroad Company than that it favors the Manhattan Elevated Railroad Company. The clause relates to the plan and construction of the bridge solely, and has no relation to the operation or use of the railroad tracks after the bridge is completed. Section 5 of the law authorizing the construction of the bridge grants to the commissioners the power to contract with any corporation to operate a railroad across said bridge if they shall determine that to be in the public interest. Such a power, if exercised at all, must be exercised during the period of construction, as, under section 7 of the act, upon its completion, the care, management, and control of the bridge become vested in the trustees of the New York and Brooklyn Bridge, who will possess in relation thereto the same power now vested in them in relation to the existing bridge. Having, therefore, the power during construction to enter into a contract with any corporation to operate a railroad across said bridge, there is nothing illegal in contracting to construct the bridge in such manner as will permit the use thereof by an elevated railroad company after it is completed. Moreover, the commissioners possess the broadest power possible as to the plan of the bridge. The act puts no limitation upon their power in this respect beyond what to them shall seem best for the public interest. The determination of the question as to the purchase of the bridge company's franchise necessarily involved consideration of the location and plan of the bridge. These matters could not properly be considered separate and apart from one another, and when the commissioners had determined upon the location and plan of a bridge which made necessary the purchase of the bridge company's franchise there was nothing improper, certainly nothing illegal, in agreeing with the bridge company to construct the bridge upon a particular plan, if, in their judgment, such

agreement, in abating the amount to be paid to the bridge company or otherwise, was beneficial to the public interest. And we accordingly find in the affidavit of Mr. Baird and the report of the committee made to the commissioners on November 19, 1895, that for the reasons therein fully set forth the commissioners did, in considering the question of the purchase of the bridge company's franchise, resolve to construct the bridge with two tracks for the exclusive use of elevated railroads, with suitable terminal facilities in New York City. Having located the bridge at a point which necessitated the purchase of a part of the rights of the bridge company, and having adopted a plan involving the construction of railroad tracks, it is impossible to perceive that there is any ground for the contention that the agreement to construct the bridge upon the adopted plan is illegal.

(2) The charges of fraud may be dismissed from the case. The allegations of the complaint on this subject are of the most general character, and are not sustained by a scintilla of proof. They received no attention from the learned judge at special term, and the counsel for the plaintiff in this court stated orally that he possessed no knowledge or proof of any fraud. The injustice and impropriety of inserting in a legal pleading unfounded and unsupported charges of this character against public officials is so gross that the plaintiff's course in this respect is properly the subject of severe criticism.

(3) It remains to consider whether the contract is subject to the criticism that it causes a waste of the public funds or property of the two cities. From what has already been said, it is apparent that the clause of the contract in reference to the construction of railroad tracks and terminals is not a waste of property. Those things are but parts of the plan of the bridge, and, as I have already pointed out, this clause is not susceptible of the construction that it grants an exclusive privilege to any corporation. So far from raising any implication of that character, the affidavits in the case prove directly the contrary. Two propositions were made by the bridge company to the commissioners before the one which was finally accepted. Neither contained any proposal for the exclusive use of the railroad tracks. Each contained a provision that the Brooklyn Elevated Railroad Company should be permitted to operate its trains across the bridge, but each also provided that other elevated railroads should also be permitted to cross the bridge. Both of these propositions were rejected, and the one finally accepted and embodied in the contract relates to the plan of construction solely. Neither the bridge company nor any elevated railroad company has any rights in the contract which would enable them to make use of the bridge after its completion, and there is nothing before the court indicating any intention on the part of the commissioners even to exercise the power they possess to contract with any corporation to operate a railroad on the bridge, and, as I have already pointed out, unless that power is exercised before the bridge is finally completed, it will pass under the control and management of other officials.

We come, therefore, finally to consider the question whether there is anything in the nature of waste of public funds in the agreement to pay $200,000 for the franchise of bridge No. 1 and the extinguishment of the right of the bridge company to construct bridge No. 2 north of Grand street. The allegation of the complaint that this franchise was worthless appears to rest upon the assumption that the charter of the bridge company had been forfeited. This assumption has no support in the act incorporating the bridge company so far as it relates to bridge No. 1. The statute requires the company to begin the construction of bridge No. 1 within one year from the date on which assent was given thereto by the proper federal authorities, and to begin the construction of bridge No. 2 within one year from the date of the opening of bridge No. 1 to public use. The only reference which the statute makes to forfeiture by reason of a failure to begin construction is contained in the sixteenth section and refers exclusively to bridge No. 2. The learned judge at special term overruled this contention of the plaintiff, and properly held that the charter of the bridge company could be declared forfeited only by a judgment of this court rendered in an action brought for that purpose by the attorney general in the name of the people of the state. The decision of the learned judge who heard the case at special term proceeded in this branch of the case upon a misconception of the facts in relation to the location of bridge No. 2. He appears to have understood that the bridge company had definitely located bridge No. 1, but had not located bridge No. 2, and he held correctly that until bridge No. 2 was located the bridge company possessed no exclusive right to construct it upon any particular defined line. It is not alleged in the complaint, nor does it appear from the plaintiff's affidavits, that bridge No. 2 had not been located. The proof upon that subject appears in the affidavits read in opposition to the motion. The affidavit of Mr. Cornell, the engineer of the bridge company, treats both bridges, in this respect, alike. He testifies that the "bridges and approaches" had been located, and that the secretary of war had given his consent to the company "to construct its bridges." He produced a map of bridge No. 1, which he says was a copy of the one approved by the secretary of war; and this fact may have misled the learned judge to assume that bridge No. 1 only had been located. The affidavit, however, states that plans for both bridges had been transmitted to the common council of New York, and that that body had given its consent to the construction of "the bridges and approaches." Attached to Mr. Cornell's affidavit is a detailed statement of the plans and locations of both bridges. Bridge No. 2 is therein located with the same definiteness as bridge No. 1. The piers and towers on the Brooklyn side are located in the block bounded by Gold street and Hudson avenue, John and Plymouth streets, and on the New York side in the block bounded by Scammel, Jackson, Cherry, and Water streets. Thence the bridge extends to Grand street, and across Grand street to connect with bridge No. 1 between Delancy and Rivington streets. These facts are uncontradicted in the record before the court. I find

no provision of the statute requiring these bridges to be located by filing maps and plans in any public office, and for the purpose of this motion we must assume that the fact is that bridge No. 2 was located in such a way as to extend north of Grand street, and connect with bridge No. 1. But we are also of the opinion that, if bridge No. 2 had not been located by the company, the statute definitely locates it so far as it relates to the contract under consideration, by requiring it to be in junction at the New York end with bridge No. 1. It became important, therefore, for the commissioners, having located their bridge, to extinguish the right of the bridge company to construct bridge No. 2 north of Grand street, and the evidence does not permit the conclusion that in agreeing to purchase and acquire that right the commissioners purchased a worthless franchise. But assume, for the purpose of the case, that bridge No. 2 had not been definitely located. There was the claim of the bridge company to a right north of Grand street, and prudence and good judgment dictated that that claim should be extinguished. An individual purchaser of real estate always desires to acquire a valid title, and seeks to purchase not only all existing and outstanding titles to the land he buys, but also to extinguish all possible claims, and thus free himself from possible litigation and expense. The same motive justified the commissioners in extinguishing the possible claim of the bridge company to the right to build bridge No. 2 north of Grand street, even if they were of the opinion that the company had, by failing to locate the bridge, neglected to perfect that right. Possible litigation was thereby avoided, and time and money saved.

Upon the question of the propriety of locating the line of the bridge in such a manner as to make necessary the purchase of the bridge company's franchise, little need be said. The reasons for that act are fully set forth in the affidavit of Mr. Baird and the report of the committee made to the commissioners. The facts there stated will convince any impartial mind that the action of the commissioners in this respect was one dictated by sound judgment, and solely in the public interests. Briefly stated, they were that the chief engineer of the commission, having been instructed to ascertain and report to the commissioners what line could be adopted for the construction of the bridge within the territorial limits prescribed by law, reported that four lines, including that adopted and located by the bridge company, were practicable. The most northerly line, which began in Brooklyn near the foot of South First street and reached New York in Stanton street, was rejected by the commission, as not being in compliance with the law which required the bridge to be built between points near the foot of Broadway in Brooklyn and the foot of Grand street in New York, and also for the reason that it would not form a proper connection between the established line of travel between the two cities. The second line, which began in Brooklyn near the foot of South Fifth street, cut through the property of the American Sugar Refining Company, and was rejected because of the large land damages that would have

been incurred by its adoption, and the loss that the city would probably sustain from the interference with and possible removal of a large and important industry. The selection of either of the other two lines rendered necessary the purchase of the franchise of the bridge company, and the report shows the adoption of the one which gave the shortest route and the lowest estimate of cost of construction. The propriety of the selection of this line is not questioned by the plaintiff nor criticised by the learned judge at special term. Neither can the amount paid be said to be exorbitant. No affidavits were read as to the value of such a franchise, and it is clear to the court that the amount agreed to be paid was not unreasonable.

It is sufficient to say, in closing an opinion that has already exceeded a proper length, that both the location of the bridge and the sum to be paid to the bridge company were matters resting solely within the sound judgment and determination of the commissioners, and their conclusion is not subject to the review of the courts, unless there has been a waste of the public funds. There is nothing in the case before us that would, on that ground, justify us in interfering with their action.

The order should be reversed, with $10 costs and disbursements, and the motion denied, with costs.

PRATT, CULLEN, and HATCH, JJ., concur.

BARTLETT, J. (concurring). I doubt whether the commissioners, under the power which the statute gives them to purchase the charter of the East River Bridge Company, have any authority to make part payment for that charter by binding themselves to construct the new bridge in a particular form. I think the statute contemplated a purchase for money, and that only. But this view need not prevent me from concurring in the result reached by my associates. If it be correct, the provision in the agreement as to the form of the structure is not enforceable by any one. Its presence is harmless, and affords no ground for judicial interference at this time, because no one is trying to enforce it. Indeed, it is harmless for another reason. The commissioners have unquestionable power to build the bridge in the stipulated form, independent of any agreement on the subject. While, therefore, I concur with my brethren on all other points, and agree that the preliminary injunction should be vacated, I deem it proper to add these remarks, lest I should seem to sanction the idea that the agreement has the effect of conferring any right upon the East River Bridge Company so far as it provides for elevated railroad accommodations of a particular kind on the new bridge.