The City of New York, Plaintiff, *v.* The Brooklyn City Railroad Company, Defendant.

(Supreme Court, Kings Special Term for Motions, April, 1921.)

Bridges — statutes — right of city of New York to operate railroad over Williamsburg bridge — municipal corporations — railroads — constitutional law — Greater New York Charter, as amended in 1901, § 595(5) — Public Service Commissions Law, § 53 — Railroad Law, § 22 — Laws of 1916, chap. 528 — Laws of 1897, chap. 663.

> The provision of section 595(5) of the Greater New York Charter, as amended in 1901, by which the commissioner of bridges, who still had the management and maintenance of the New York and Brooklyn bridge and control of the operation of the railroad thereon, was given in general terms the management of all other bridges, was followed by an express provision abolishing the Williamsburg bridge commission, and all its powers and duties, one of which was to operate and authorize to be operated a railroad over said bridge, were duly transferred to the commissioner of bridges of the city of New York and by a later statute (Laws of 1916, chap. 528) to the commissioner of plants and structures of said city. (Pp. 101, 102.)

> The legislative act (Laws of 1897, chap. 663) which provided that the trustees of the Brooklyn bridge might continue to

maintain and operate the then present railroad thereon did not limit the power already delegated the Williamsburg bridge commission, which in turn is devolved upon the present commissioner of plant and structures, and the city of New York through that official has an existing right to operate a railroad on the Williamsburg bridge.   (P. 102.)

*Dilluvio* v. *City of New York,* 73 Misc. Rep. 122, distinguished. (P. 103.)

The legislature having granted to the city of New York the right to operate a railroad on said bridge and there being no place thereon for the storage of cars it must be held that as a necessary implication to such grant the city may erect a barn underneath the structure of the bridge and by necessary trackage connect the existing bridge tracks with the barn, and if in the course of making such connection it is necessary to cross the tracks of the defendant railroad company now operating over the bridge as licensee only and free to abandon the bridge service at any time, the law allows such crossing over.   (P. 104.)

An application by the city of New York under section 22 of the Railroad Law for the appointment of commissioners to determine the compensation, if any, to be awarded defendant as a condition of constructing a cross over on its tracks, etc., will be granted and the obtaining of a certificate under section 53 of the Public Service Commissions Law is not a necessary prerequisite.   (Id.)

The legislature has constitutional power to grant to a municipal corporation the right to operate a railroad on the Williamsburg bridge, which, besides being an aerial highway, has been declared by statute to be a public highway.   (P. 105.)

APPLICATION by city of New York for the appointment of three commissioners under section 22 of the Railroad Law.

John P. O'Brien, corporation counsel (Joseph A. Devery, Alex I. Hahn, of counsel), for plaintiff.

Cullen & Dykman (William N. Dykman, Sigourney B. Olney, of counsel), for defendant.

KELBY, J.   Application by the city of New York, under section 22 of the Railroad Law, for the appointment of three commissioners to determine the amount

of compensation, if any, to be awarded the defendant as a condition of constructing a cross-over on the defendant's railroad tracks, and to determine the line or lines, grade or grades, points or manner of such connection, as provided in said statute. The city owns the Williamsburg bridge and owns the railroad tracks constructed upon it. The Williamsburg bridge was opened in 1904, and since that time surface railroad companies of both Brooklyn and Manhattan have operated the local and through service over the city's railroad tracks on said bridge. The fare on the local lines operated over the said bridge is at present three tickets for five cents and upon the cars operating a through service from points in Brooklyn to Manhattan or *vice versa* no extra fare is collected from passengers. Originally there were contracts entered into between the city and the operating railroad companies which have since been terminated, and the railroad companies now operating over said bridge are doing so as licensees only, subject to being ejected by the city without notice at any time, and, on the other hand, the railroads are free to abandon the bridge service at any time, they having no franchise on the bridge and being subject to no contractual liability to operate over the bridge. On April 27, 1920, the board of aldermen adopted an ordinance, which was duly approved by the mayor of the city of New York on May 3, 1920, which in effect said that after the termination of any existing right no permit should be granted to or any contract entered into with any person or corporation allowing such person to operate cars on the tracks owned by the city of New York over the Williamsburg bridge and the approaches on the route known as the bridge local service and at that time operated by the Bridge Operating Company. It was further declared in said ordinance that immediately after the

termination of then existing permits all the said trans-
portation service over the said bridge local route
should be operated directly by the city of New York
and the department of plant and structures was
designated as the agency for the city in the operation
of such service.  It was further declared as the policy
of the city authorities that the fare to be charged for
passage on the cars so to be operated by the city
should '' in no case be fixed at a sum greater than the
amount necessary to cover the cost of operation of
such service, plus the necessary reserve for sinking
funds and depreciation.''  By subsequent ordinances
the commissioner of plant and structures was author-
ized, after provision for funds had been made, to enter
into contracts for the construction of a barn and for
the laying of rails from the Brooklyn plaza of the
Williamsburg bridge to the barn, and for the purchase
of cars, and also agreements for supplying the elec-
trical current; all in connection with the operation of
the local line on the Williamsburg bridge, with a
limitation that the amount involved should not exceed
$300,000.  Thereafter the comptroller of the city of
New York was authorized to issue corporate stock
in amount not exceeding $300,000, to be applied for the
purchase of trolley cars, extra parts, constructing new
car barn, and other necessary equipment for the pur-
pose of operating a local trolley line on the Williams-
burg bridge.  Subsequently the board of estimate
amended a preceding resolution on September 24, 1920,
and in this resolution declared that the proposed
improvement was determined to have substantial
present or prospective earning power.  The moving
papers show that the city purchased cars and that it is
now constructing a car barn under the structure of the
Williamsburg bridge between Bedford avenue and
Berry street, and that it is constructing a single track

7

along the side of the said bridge for the purpose of connecting the city owned track on the bridge with the city barn now in construction. To do this it will be necessary, it is alleged, to lay the city's tracks across the tracks of the defendant company, located on Driggs avenue and Bedford avenue, and which streets pass under the existing structure of the Williamsburg bridge. It is further alleged that the parties cannot agree upon the amount of compensation to be paid for the crossing or upon the line or lines, grade or grades, points or manner of such crossings or intersections. On the part of the defendant it is alleged (1) that neither the city nor the commissioner of plant and structures has any franchise or power or authority to operate a railroad over the Williamsburg bridge; (2) that the city has not, nor has Mr. Whalen, commissioner of plant and structures, obtained a certificate of convenience and necessity, required by section 9 of the Railroad Law, or the permission and approval required by section 53 of the Public Service Commissions Law, and, finally, it is contended by the defendant that any legislative delegation of power to the city to operate a railroad would be and is unconstitutional because of the prohibition contained in the state Constitution in article VIII, section 10. Taking up these positions in their order, we first discuss the power of the city to operate a railroad on the Williamsburg bridge. The construction of the Williamsburg bridge was authorized by an act of the legislature which became a law on May 27, 1895. This act provided for the appointment of three commissioners by the mayor of the then city of New York and three commissioners by the mayor of the then city of Brooklyn, which six commissioners with the respective mayors of both cities constituted a commission for the purpose of constructing the Williamsburg bridge. These commissioners

were authorized to prepare a plan for the bridge, were given powers to take over property by eminent domain, and the right to acquire the land under water also. The act also prescribed that if any corporation should possess a valid charter with authority to construct a bridge such as was contemplated by the provisions of this act, that the commissioners, with the express consent of the mayors and comptrollers of the respective cities, might purchase said charter at a price to be mutually agreed upon, *and thereby to take or extinguish any existing right of such corporation to operate any railroad across said bridge. But nothing in this act contained shall prevent said commissioners, in their discretion, from contracting with any corporation to operate a railroad across said bridge if said commissioners shall determine it to be in the public interest.* Section 7 of said act then prescribed as follows: " When the said bridge shall be completed the said commissioners shall make their final report. * * * and they shall file all their records and papers in the office of the trustees of the New York and Brooklyn bridge (the old Brooklyn bridge). The said bridge shall thereupon be and become a public highway for the purpose of rendering travel between the cities of New York and Brooklyn safe and certain at all times, *and · the care, management and control thereof shall be vested in the trustees of the New York and Brooklyn bridge, * * * who shall possess in relation thereto like powers as are vested in them in relation to the said New York and Brooklyn bridge.*" It will also be observed that these powers were not to be exercised by the trustees of the Brooklyn bridge until the completion of the Williamsburg bridge. Subsequently, in 1896, section 7, above quoted, was amended by chapter 612 of the Laws of 1896, and the main change is found in the following words: " The said

bridge shall thereupon be and become a public highway for the purpose of rendering travel between the cities of New York and Brooklyn safe and certain at all times, and the care, management and control thereof shall be vested in the said commissioners and their successors, *who shall possess in relation thereto like powers as are at the time of the passage of this act vested in the trustees of the New York and Brooklyn bridge in relation to the said New York and Brooklyn bridge, unless the legislature shall otherwise provide therefor.''* Early in the year 1896 a taypayer's action was commenced by William Gordon against the then mayor of the city of New York and others to annul a certain contract whereby the commissioners of the Williamsburg bridge agreed to purchase a franchise possessed by the East River Bridge Company. In the course of the opinion in this case the Appellate Division of this department (3 App. Div. 395) held that a clause in the contract did not purport to grant the use of the tracks on the bridge to any corporation; that it related to the plan and construction of the bridge solely and had no relation to the operation or use of the railroad tracks after the bridge was completed. And it was further held that section 5 of chapter 789 of the Laws of 1895 grants to the commissioners the power to contract with any corporation to operate a railroad across said bridge, and that such power, if exercised at all, must be exercised during the period of construction, because, under section 7 of the act just quoted, upon the completion of the bridge the management and control became vested in the trustees of the old Brooklyn bridge. The legal effect then of this amendatory act of chapter 612, Laws of 1896, was to vest in the Williamsburg bridge commissioners powers not only during the construction of the bridge, but also powers

continuing upon the completion of the bridge, and gave to the said Williamsburg bridge commissioners, after completion of the bridge, the same powers as were exercised by the trustees of the old Brooklyn bridge over the said old Brooklyn bridge, and that the powers so delegated were the powers exercised by the Brooklyn bridge trustees over the Brooklyn bridge itself as of the date of the passage of the act, namely, May 13, 1896. A pertinent inquiry at this time therefore is, what powers did the trustees of the old Brooklyn bridge on May 13, 1896, exercise over the old Brooklyn bridge? The answer to this query is found in chapter 300 of the Laws of 1875, section 7: " The said trustees shall have power to fix the rates of toll for persons, vehicles and animals of every kind and description passing over the said bridge; *and may operate and authorize to be operated, a railroad or railroads over said bridge,* and fix the fare to be paid by any passenger on any railroad operated by them." The powers thus devolved on the trustees of the Brooklyn bridge were continued by the Consolidation Act (Laws of 1882, chap. 410, § 1980). The original charter of the city of New York, passed in 1897, being Laws of 1897, chapter 378, section 595, provides in substance as follows: The commissioner of bridges shall have cognizance and control of the management and maintenance of the New York and Brooklyn bridge, of the operation of the railroad on the New York and Brooklyn bridge, and of the construction, repair, maintenance and management of all other bridges except " The East River Bridge " (that is, the Williamsburg bridge). And the reason for this exception was that the Williamsburg bridge commission was still in existence and the Williamsburg bridge was still in the course of construction. The charter was amended in 1901, and by section 595

the commissioner of bridges still had the management and maintenance of the New York and Brooklyn bridge and had control " of the operation of the railroad on the New York and Brooklyn bridge." And in subdivision 5 " the bridge commissioner was given, in general terms, the management of all other bridges." This is followed by an express statement that the Williamsburg bridge commission " is hereby abolished, and all its powers and duties are hereby devolved upon the Commissioner of Bridges of the City of New York." From the foregoing it seems reasonably clear that the Williamsburg bridge commission had the power to operate and authorize to be operated a railroad over the Williamsburg bridge, and that this power has been duly transferred to the commissioner of bridges of the city of New York, and by chapter 528 of the Laws of 1916 to the commissioner of plant and structures. The act of the legislature, cited by the defendants, namely, chapter 663 of the Laws of 1897, regulating the carriage of passengers across the New York and Brooklyn bridge, has not been overlooked. That, in effect, stated that the trustees of the Brooklyn bridge might continue to maintain and " to operate the present railroad on said bridge." This act does not limit the power already delegated the Williamsburg bridge commission, which in turn is devolved upon the present commissioner of plant and structures of the city of New York. It is therefore concluded that the city of New York, through its commissioner of plant and structures, has an existing right to operate a railroad on the Williamsburg bridge. While this express question has not been before the court, the analogous question as to whether the bridge commissioner could make a contract for the operation of street surface cars over the Williamsburg bridge has been decided. In the

case of *Schinzel* v. *Best,* 45 Misc. Rep. 455, it was held
that such a contract was a valid one, and that the
bridge commissioner had full power to make such con-
tract. And while any expressions in the opinion as
to the powers to operate a railroad are dicta merely
and not binding upon the court, still they are persua-
sive in their argument and were adopted by the
Appellate Division in confirming the judgment on the
opinion of Judge Maddox at Special Term (109 App.
Div. 917). As to the case of *Dilluvio* v. *City of New
York,* 73 Misc. Rep. 122, that action involved the
power of the city to operate a railroad over the
Queensboro bridge, and the decision in that case was
undoubtedly correct, holding that the city had no such
power. But there is no such devolution of powers
found in the statutes with reference to the Queens-
boro bridge as have been cited in support of such
power in relation to the Williamsburg bridge. There
is, therefore, the resulting anomaly that the city has
the power to operate a railroad on the Brooklyn
bridge and upon the Williamsburg bridge, but no
power to operate a railroad on the Queensboro bridge.
The next question presented is " Must the city, with
the power to operate a railroad, first obtain a cer-
tificate of convenience and necessity, as required by
section 9 of the Railroad Law, or the permission and
approval required by section 53 of the Public Service
Commissions Law? " There can be no doubt that if
the city of New York embarks in the railroad busi-
ness that it must do so subject to the limitations of
the legislature as found in the Railroad Law. The
city becomes a common carrier and has no greater
rights, nor can it escape any liability of a common
carrier. It has been held that the grant of a street
railroad franchise carries with it by implication the
right to maintain sidings and switches and that a

spur necessary to enable a railroad to connect with a storehouse for its cars without which the line could not be operated at all was also a right incident to the grant. See *Brooklyn Heights R. R. Co.* v. *City of Brooklyn,* 152 N. Y. 244; *Brooklyn Heights R. R. Co.* v. *Steers,* 213 id. 76, 81. It, therefore, follows that the legislature having conferred the right to operate a railroad over the Williamsburg bridge to the city of New York, there being no place on the bridge for the storage of cars, that as a necessary implication to this grant the city may erect a barn underneath the structure of the bridge and by necessary trackage connect the existing bridge tracks with the barn. If in the course of making this connection it is necessary to cross over the tracks of the defendant the law allows such crossing over. In the case of *Village of Ft. Edward* v. *Hudson Valley R. R. Co.,* 192 N. Y. 139, it was held that a certificate under section 53 of the Public Service Commissions Law is not necessary where a railroad is constructing a crossing under section 22 of the Railroad Law. It is concluded, therefore, that no such certificate is necessary in this case and that the public service commission has correctly passed upon the proposition in the instant case when application was made to it. There remains, then, solely the question as to whether the legislature has the power to grant to a municipal corporation the right to operate a railroad. Such a grant, it is claimed, is in violation of article VIII, section 10, of the state Constitution, which, among other things, provides: " Nor shall any city be allowed to incur any indebtedness except for city purposes." This question was considered by the Court of Appeals in the case of *Sun Printing & Publishing Co.* v. *City of New York,* 152 N. Y. 257. There in substance it was held that a subway was a subterra-

nean highway. If a subway is a subterranean highway it seems equally clear that a bridge is an aerial highway. Moreover, there is an express legislative declaration that the Williamsburg bridge is a public highway. With the proposed policy of the commissioner of plant and structures and the city authorities in operating this railroad the court has nothing to do. It seems fairly apparent at this time that the immediate result of operating the railroad over the Williamsburg bridge by the city of New York will be to cause the discontinuance of all existing service of the various trolley lines now operating over said bridge. The commissioner of plant and structures thinks that this is a result to be attained and that much good will flow to the public by the operation of the city line. The existing trolley railroads contend that they cannot compete with the city at a cut price contemplated by the city, which, by the resolution of the city authorities, is limited to cost plus sinking fund charge. If the results in the future are that the public comfort and convenience are greatly increased, clearly the credit for such increase of comfort should be accorded to the city authorities. It is equally apparent that if the result is an increase of present discomfort and confusion, so that we have confusion worse confounded, then the blame for this result can readily be traced. This is not a function of the court. This is purely an executive function and the responsibility lies upon the officers of the city and not upon the court. An order may be entered appointing three commissioners under the statute.

Ordered accordingly.