(24 App. Div. 73.)

### HEARST v. BERRI et al.

(Supreme Court, Appellate Division, First Department. December 31, 1897.)

1. BROOKLYN BRIDGE—CONTRACTS BY TRUSTEES—RAILWAYS ON BRIDGE.

Under sections 3, 4, c. 663, Laws 1897, the trustees of the Brooklyn Bridge were authorized to contract with certain railroad corporations to permit them to carry passengers over the bridge, and were directed to prepare plans regulating the operation of cars "as such trustees shall deem best adapted to promote the public comfort and convenience, * * * and except as otherwise provided by such trustees, such plans and specifications shall be in substantial conformity with" certain designated plans. They were directed to prepare the form of contract and specifications "regulating the operation of the said cars * * * and the establishment of its route or their routes. * * *" The original contract executed thereunder followed the designated plans in providing for an elevated terminus at the New York City end, with elevators, leaving a clear passage for pedestrians. Thereafter, in view of various objections to the original plans, the contract was modified so that the plans called for a terminus at the level of the roadway, with loops crossing the passageway for pedestrians, and provided for gates to close such passageway when-

ever the cars were crossing it. In a taxpayer's action to restrain the construction of the tracks under this supplemental plan, as being "contrary to law," *held*, that the variations from the plans designated by the statute were within the scope of the trustees' discretion, and that the work should not be enjoined pending the action.

**2. SAME.**

*Held*, further, that if the operation of the road, when undertaken, should prove to be dangerous and improper, the public could be adequately protected in the final disposition of the action, by injunction or otherwise.

Van Brunt, P. J., and Patterson, J., dissenting.

Appeal from special term.

Action by William R. Hearst against William Berri and others. From an order continuing, during the action, an order restraining the construction of surface-railroad tracks on the New York City terminus of the New York and Brooklyn Bridge, defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

James C. Bergan, for appellants.

B. F. Einstein, for respondent.

WILLIAMS, J.    The action was brought under section 1925 of the Code of Civil Procedure, by a taxpayer, against the trustees of the bridge, to restrain the construction of the tracks, on the ground that the work was being done in a manner contrary to law, and the injunction order was granted, and must be sustained, if at all, upon this ground.   Prior to 1897 some general powers had been conferred by the legislature upon the trustees to operate or cause to be operated railroads over the bridge, but by chapter 663 of the Laws of 1897 the legislature made special provisions on this subject, and the contracts subsequently made between the trustees and the railroad companies, under which the railroad tracks in question were being constructed, made express reference to this act of 1897, and we think it must be considered that the contracts were made in pursuance of the provisions of this act.    The act became a law on the 22d of May, 1897, and the original contract was made August 23, 1897.    By section 3 of that act the trustees were "authorized and empowered to contract with any street surface or elevated railroad corporation" of New York or Brooklyn, so as to permit such corporation to carry passengers across the bridge, and by section 4 it was provided:

"Within sixty days after the passage of this act, the said trustees shall prepare plans and specifications, regulating the operation over said bridge of the cars of such corporation or corporations, with whom it may contract, as such trustees shall deem best adapted to promote the public comfort and convenience, and to subserve the purposes for which such bridge was constructed, and except as otherwise provided by said trustees, such plans and specifications shall be in substantial conformity with the plans recommended to the said trustees, by Virgil G. Bogue, George H. Thompson, and Leffert L. Buck, expert engineers, by their report bearing date February 8, 1897. And said trustees shall also prepare such form of contract and specifications thereunder, as they shall deem best fitted for the public interests, regulating the operation of the said cars of the said corporation or corporations, and the establishment of its route or their routes upon such bridge and shall have power to exact such bond or obligation as they may deem proper for the faith-

ful performance of any contract or contracts, made with any and all said corporations as aforesaid."

By such original contract, the tracks across the bridge were to be laid upon the roadways for the passage of vehicles, the track for cars from Brooklyn to New York on the northerly side of the north roadway, and the track for cars from New York to Brooklyn on the south side of the south roadway, and these two tracks were to be brought into the station at the New York terminus, at an elevation and upon an elevated structure which would enable them to pass over and above the existing bridge railroad tracks, and there were to be constructed and operated elevators by which passengers using the cars should be raised and lowered between the surface of the street and the level of the structure upon which the tracks were so constructed, and where the passengers were to be received and discharged from the cars. The tracks on either side of the bridge were then connected by curves or loop tracks upon this elevated structure. These plans were in substantial conformity with those recommended to the trustees by the expert engineers, referred to in the act of 1897.

On the 29th of September, 1897, a new contract, supplemental to the original contract of August 23, 1897, was made. By this supplemental contract the plans provided for by the original contract were somewhat changed. The track upon the north roadway across the bridge was to be located on the south side, instead of the north side, of the roadway, and the track upon the south roadway was to be located on the north side, instead of the south side, of the roadway. The elevated structures for bringing the tracks crossing the bridge into the station at the New York terminus were dispensed with, together with the passenger elevator, and all other constructions needed for receiving and discharging passengers at an elevation and upon an elevated structure. The tracks across the bridge were to come into the New York station on the roadway, and were to be connected with each other at the terminus by curves or loop tracks upon the surface of the approach to the bridge, across the passageway used by pedestrians. There were to be four such curves or loop tracks crossing from the northerly to the southerly bridge tracks, and the cars were to be operated thereon in the station, at the New York terminus, as follows: The cars coming from Brooklyn were to enter upon the curves or loop tracks for a short distance, and stop before crossing the passageway used by pedestrians, and there discharge their passengers, and when there was one car on each curve or loop track, and all passengers had been discharged therefrom, the passage of pedestrians along the passageway across the four tracks in front of the cars should be checked by gates or other appropriate appliances, and the four cars should then pass together across the passageway, and stop near the southerly end of the curves or loop tracks, and then pedestrians should be allowed to proceed along the passageway again, until checked for another passage of four cars; the passage of the cars over the passageway to occupy 5 seconds each time, and to pass over at intervals of not less than 45 seconds, and the four cars to receive their passengers at the points where they stopped, near

the southerly ends of the curves or loop tracks, and from thence proceed by the southerly roadway across the bridge to Brooklyn. By the supplemental contracts the plans also provided that there should be constructed, under the curves or loop tracks, tunnels or subways, whereby pedestrians might, if they so desired, pass beneath, instead of waiting while the cars were crossing the passageway used by the pedestrians. It was this proposed construction and operation of the tracks and cars which the injunction order restrained, and it was claimed that this construction and operation was contrary to law, in that, under the act of 1897, the parties had no legal right to make the change in the construction at the New York terminus from an elevated structure to a structure on the surface of the roadways, and across the surface way used by pedestrians; and the reason for the interference by the court was that the new construction and operation would be extremely dangerous to the public who had occasion as pedestrians to travel along the passageway crossed by the curves and loop tracks and the cars used thereon.

It is said that the act of 1897 provided the plans and specifications for the contract between the parties should be in substantial conformity with those recommended by the expert engineers, "except as otherwise provided by the trustees," and that the change from the elevated structure to the surface structure was a violation of the statute, and was therefore unlawful; that, while the trustees might provide for some changes in the plans, they could not legally make such a change as this. It seems to us, however, that this change was fairly within the purview of the statute, and was authorized by the language of the exception in the act. The general plans for the construction across the bridge and at the terminus remained unchanged. There was found to be great difficulty in the way of carrying out the original plan of elevated structure at the New York terminus. The curves or loop tracks provided for in the plans annexed to the original contract were located at the place over the street where there was no legal right to construct them. Moreover, the elevated structure, and the elevated station, and the elevator to carry the passengers between the street surface and the upper floors, where passengers were to be received and discharged from the cars, were not only expensive and troublesome to build and operate, but it might well be claimed that more danger to the public was to be apprehended therefrom than from the more simple and inexpensive surface construction and operation provided for by the supplemental contract. In fact, it would seem that little danger was to be apprehended from the surface construction and operation proposed, and the only objection thereto would be the impediment to travel by pedestrians by reason of the checking of travel while the cars were crossing the passageway. No additional facilities can be afforded the public for getting across the bridge, however, which will not in some way interfere with such travel. It must be expected and suffered. The same result follows the use of the streets of the city for surface and elevated car lines, and would follow underground lines of railroad, and yet the inconvenience, and dangers, even, resulting from these

various street lines of roads, to those having occasion to pass along or across the streets on foot or with vehicles, would not be regarded as sufficient reasons for restraining the construction and operation of such railroad lines.

Under the statute and the contract between the parties, it is the duty and the right of the trustees to control and direct the operation and management of the surface railroad, across the bridge and at the terminals; and, should the operation of the cars on tracks at the New York terminus now proposed to be carried out prove, on trial and from experience, to be particularly dangerous to the public, or for any other reason improper, such modification thereof as should be deemed necessary could be made and enforced by the trustees.    There does not seem to be any way now to return to the plans for an elevated structure, such as was provided for by the original contract.    We assume there is the same impossibility to construct the curves or loop tracks upon the elevated structures, and the tracks across the bridge have very likely been laid, and cannot well be connected with the elevated structure, being on the inner sides, instead of the outer sides, of the roadways. It seems to us the injunction, under all the circumstances, would practically prevent the construction or operation of the railroad across the bridge at all, and that it should not have been granted. The parties should be permitted to complete the construction, without being prevented by the injunction, and if the operation of the road, when it is undertaken, proves to be dangerous and improper, the court can protect the public adequately in the final disposition of the action, by injunction or otherwise.

The order appealed from should be reversed, the motion to continue the injunction denied, and the injunction vacated, with costs of appeal and motion to the appellant.

INGRAHAM, J.    I concur with Mr. Justice WILLIAMS.    By section 4 of chapter 663 of the Laws of 1897 the trustees of the Brooklyn Bridge are required to prepare plans and specifications regulating the operation over said bridge of the cars of such corporation or corporations with whom it might contract as such trustees should deem best adapted to promote the public comfort and convenience, and to subserve the purposes for which such bridge was constructed.    Here there is imposed upon the trustees a clear duty to prepare plans and specifications, and vesting them with a broad discretion as to those plans and specifications.    They are to be such as the trustees may deem best adapted to promote the public comfort and convenience, and to subserve the purposes for which said bridge was constructed.    Then follows a direction to the trustees that, except as otherwise provided by said trustees, such plans shall be in substantial conformity to the plans recommended by the expert engineers.    Now, this whole section must be taken together, and the intention of the legislature ascertained from the language used.    The statute requires the trustees to prepare the plans and specifications.    They are not to adopt the plans prepared by the engineers or any one else.    The responsibility is thrown upon them, and the plans and specifications are to

be such as they shall determine in their discretion to be for the public interest. The clause that follows provides that they shall be in substantial conformity to the plans recommended by the expert engineers, except as otherwise provided by the trustees; thus plainly referring to the former provision in the section that the modification shall be such as is considered necessary by the trustees to promote the public comfort and convenience, and to subserve the purposes for which the bridge was constructed.

In reading this whole section together, it seems to me to be clear that it was intended to place upon the trustees the responsibility of preparing plans which would be in substantial accordance with the report of the expert engineers, except as to such modifications as the trustees might, in their opinion, determine to be for the public comfort and convenience. Now, it is clear that, on the whole, these plans are in substantial conformity to the plan recommended by the expert engineers. The modification is as to the loop at the New York end of the bridge. The plans submitted by the engineers required that loop to pass over the pathway of the bridge by an elevated structure. The plan as finally modified by the trustees allows the tracks of this loop to cross directly upon this pathway. In determining the question, the trustees had before them the problem of the passengers' use of the cars, and the pedestrians' use of the bridge. The elevation of the railroad tracks would undoubtedly cause considerable inconvenience to those passengers who wished to use the cars, while the depression of the tracks to the level of the surface would present some discomfort to those attempting to use the footway. In determining which should be thus incommoded, the relative number of passengers using the cars and the footway would be an important element. The facts show that those using the railroad largely predominated, those using the footway being a comparatively small number. The plan as finally adopted, while accommodating the great majority of those using the bridge. provides for the protection of those wishing to use the footway, so that there will be but an insignificant inconvenience, requiring them to wait but a few seconds for the passage of the cars. This modification seems to affect but an inconsiderable detail, in comparison with the great problem presented as to the use of the bridge. It seems to me to be clearly within the power conferred upon the trustees, being the exercise of a discretion vested in them with which the court cannot interfere.

We are not authorized, in deciding this application, to determine what, in our opinion, would be the best plan. The legislature has left that to the trustees, and they have determined, in the exercise of the discretion vested in them, that this crossing will best promote the public comfort and convenience, and subserve the purposes for which the bridge was constructed. I think, therefore, that the order appealed from should be reversed, and the motion for an injunction denied.

O'BRIEN, J., concurs.

VAN BRUNT, P. J. (dissenting). I cannot concur in the conclusion arrived at in the opinion of Mr. Justice WILLIAMS. It seems to me that the whole history of legislation is at variance with the right of the bridge trustees in any manner to interfere with the free and open access of foot passengers to such bridge. It is provided in the new charter, by section 598, as follows:

"Sec. 598. The New York and Brooklyn Bridge is hereby declared to be a public highway for the purpose of rendering travel between the boroughs of Manhattan and Brooklyn certain and safe at all times, subject to such tolls and prudential and police regulations as the municipal assembly shall adopt and prescribe: provided, however, that the passageway of the bridge now set apart for foot passengers shall remain free and open to all pedestrians coming or going at all times."

This charter became a law on the 4th of May, 1897, and it is here declared to be the policy of the legislature that the rights of foot passengers as they were then enjoyed in the use of the bridge for the purposes of passage should not in any manner be restricted or interfered with; and yet it is claimed that on the 22d of May, 1897, the legislature intentionally conferred power upon these bridge trustees practically to cut off all foot passengers from the use of the bridge. When I say "cut off from the use of the bridge," I use the words advisedly, because the necessary result of the plans which have been adopted by the bridge trustees is absolutely to deprive foot passengers for at least half of the time of the use of the bridge, and for the other half to make the safety of their access to the bridge dependent upon the obedience of trolley-line operators to rules and regulations. It seems to me incredible that the legislature could have intended to hand over this property for such an exclusive use; and, unless such an intention is plainly indicated by legislation, it should not be allowed to prevail.

At the very time that this provision of the new charter was passed, there was pending legislation in reference to the qualified use of the bridge by certain trolley lines of railroad, the project discussed being the use of the bridge by an elevated system, certainly so far as the approaches were concerned. On the 22d of May, 1897, a bill became a law whereby it was provided that the trustees should prepare plans and specifications regulating the operation over said bridge of the cars of such corporation or corporations with whom it might contract as such trustees should deem best adapted to promote the public comfort and convenience, and to subserve the purposes for which said bridge was constructed, and, except as otherwise provided by said trustees, such plans and specifications should be in substantial conformity with the plans recommended to said trustees by certain expert engineers in their report, bearing date February 8, 1897. These plans were for an elevated structure which in no manner interfered with the access of foot passengers to the bridge, and were in entire harmony with the will of the legislature as declared by the provisions of the charter above referred to. Now, under the clause, "except as otherwise provided by said trustees," the trustees of the bridge have adopted plans by which the trolley lines shall run upon the surface, and, during the passage of the cars over the footway, foot passengers shall be absolutely excluded from the bridge,—a clear violation of the express will of the legislature. There is no rule of interpretation

that ever existed which would under these circumstances justify the claim that it was the intention of the legislature to allow the trustees to cut off foot passengers from the bridge.

But it may be claimed by the trustees that they do not cut off foot passengers from the bridge. It is conceded that it is the intention so to do at stated intervals, and, as has already been stated, to make the safety of the access of foot passengers to the footway entirely dependent upon obedience of trolley-line operators to regulations. It has been urged that the bridge trustees, independent of the powers conferred by chapter 663 of the Laws of 1897, had the right to do that which has been attempted to be done by them. If such right had been conferred by other statutes, it was limited by chapter 663 of the Laws of 1897. They are there authorized to do this thing in a certain way; and, even if they had power before that to do it in other ways, this legislation necessarily restricted that power. It is plain that it was the intention of the legislature that the elevated plans, as prepared by the engineers, which the legislature had before it and referred to, were substantially the plans which were to be adopted by the trustees; and the use of the words, "except as otherwise provided by the trustees," was only intended to apply to minor details. It would seem to be a farce for the legislature to attempt to legislate upon the subject at all, if the trustees had all the power necessary prior to the legislation, and there was no intention to restrict such power. The action of the legislature would be equally meaningless if we were to hold that it intended to confer authority upon the trustees to contract in reference to certain plans, and then by the same section to remove every restriction in regard to methods of construction and operation. It is a familiar rule of construction that, where various pieces of legislation upon the same subject can be harmonized, such a construction should prevail; and harmony cannot obtain in the construction of the various acts of the legislature in respect to this subject if the trustees are to be construed to have the power to cut off foot passengers from access to the bridge.

I think the order should be affirmed.

PATTERSON, J. I concur with the Presiding Justice that the order continuing the injunction pending this action should be affirmed. The power and authority under which the trustees of the New York and Brooklyn Bridge claim the right to perform the acts restrained by the injunction appealed from is derived from the provisions of chapter 663 of the Laws of 1897. That statute relates exclusively to the carriage of passengers across the New York and Brooklyn Bridge, and authorizes the trustees of that bridge, among other things, to contract with surface or elevated railroad corporations for the transportation of passengers on the bridge, and to make plans and specifications, for operating over the bridge the cars of such corporations with which they may contract, as they may deem best adapted to promote the public comfort and convenience, and to subserve the purposes for which the bridge was constructed. That statute became a law on the 22d of May, 1897. On the 4th of May, 1897, the Greater New York

charter was passed, and by section 598 of that charter it is declared that the New York and Brooklyn Bridge is a public highway, for the purpose of rendering travel between the boroughs of Manhattan and Brooklyn safe at all times, subject to such tolls and police regulations as the municipal assembly shall adopt and prescribe, "provided, however, that the passageway of the bridge now set apart for foot passengers shall remain free and open to all pedestrians coming or going at all times." That provision relates to the use of the bridge by foot passengers. It expressly enacts that the passageway of the bridge now set apart (referring to the time at which the Greater New York charter became a law) for foot passengers shall remain free and open to all pedestrians coming or going at all times. We have, therefore, presented what may be called concurrent legislation concerning the use of the bridge,—one statute providing for the use by foot passengers, and the other providing for the conveyance of other passengers by railway vehicles. These two statutes have distinct objects. Neither conflicts nor interferes with the other. Chapter 663 of the Laws of 1897 does not in any way repeal or impair the specific provision of the section of the charter referred to. Both statutes are susceptible of enforcement, and there can be no presumption indulged in that by the later act the legislature intended in any way to impair the former. There is nothing in the phraseology of the later statute to justify such a conclusion, nor is there anything shown in the proofs in this case to indicate that the second act cannot be given full effect to without impairment of the prior act. On the contrary, it seems to be conceded that it is entirely feasible to operate the railways, without interfering with the footway, and upon plans which have been prepared and submitted, but which may not be as convenient for the companies or for the passengers to be carried by rail as the plan finally adopted by the bridge trustees.

The argument that there is nothing in the statute which gives a preference to foot passengers in the use of any part of the bridge, is altogether unsound. There is a distinct proclamation in the section cited of the Greater New York charter that foot passengers have the preferential right to the use of the bridge upon that part of the structure theretofore set apart for them; for the declaration of the statute is that that passageway shall remain free and open at all times to pedestrians, coming or going. Both these statutes may stand, and be given effect to together, and it is the duty of the bridge trustees to give effect to both. The provision of the Greater New York charter referred to substantially contains a command that a duty shall be performed of keeping the passageway open for foot passengers, and associated with that correlatively is necessarily an implied prohibition to do anything contrary to that command; and, by the terms of section 1611 of the Greater New York charter, that charter went into effect on the 4th day of May, 1897, so far as relates to acts done or forbidden prior to January 1, 1898.

The order appealed from should be affirmed, with costs.