GEORGE M. SCHINZEL, Plaintiff, *v.* GEORGE E. BEST, as Commissioner et al., Defendants.

(Supreme Court, Kings Special Term, September, 1905.)

Municipal corporations — Remedies of taxpayers — Questions raised in taxpayer's suit — Constitutional law — Distribution of powers — Delegation of legislative powers — Williamsburgh bridge — Powers of commissioner of bridges of the city of New York.

Where the complaint in a taxpayer's action to annul, as illegal, under certain sections of the Greater New York charter, a contract for the operation of street cars over the Williamsburgh bridge and to restrain the performance of such contract, fails to allege fraud, collusion or bad faith on the part of the municipal officer in so contracting, the sole question is whether he had power to make the contract.

The legislature has full power to provide for and to regulate the construction, control, care, management and operation of the Williamsburgh bridge and may delegate all its powers in that regard, the restrictions of the Constitution (art. 3, § 18) not being applicable thereto.

By special act (L. 1895, ch. 789, as amd. L. 1896, ch. 612) the construction of the Williamsburgh bridge, over the East river, which upon completion was to be " a public highway " between the cities of New York and Brooklyn, was authorized by commissioners named as provided by said statute and the care, management and control thereof were vested in said commissioners and their successors with like powers as the trustees of the New York and Brooklyn bridge, including the right to operate, or to authorize the operation of, a railroad or railroads on the bridge and to fix the passenger fare therefor unless otherwise provided; but, by the enactment of the revised and amended charter (L. 1897, ch. 378, as amd. L. 1901, ch. 466) abolishing the Williamsburgh bridge commission and devolving all its powers and duties upon the commissioner of bridges of the city of New York, the legislature has otherwise provided.

A contract for ten years, terminable on breach of condition or of covenant, made by said commissioner of bridges for the operation of cars upon said bridge, involving the use of the railroad tracks and electrical equipment owned by the city, upon the payment of a stipulated sum per annum for the use of said equipment, the operating company agreeing to keep the same and the surface tracks in good order and repair and to pay " five cents per round trip for each and every car operated or transported " across said bridge, was clearly within his delegated statutory powers, did not contravene the charter provisions (§§ 44, 45 and 71–77), and did not create a franchise or confer any right beyond the duration of the contract period.

DEMURRER to complaint.

Robert Van Iderstine (Edward S. Bronson, Jr., of counsel), for plaintiff.

John J. Delany, Corporation Counsel (James D. Bell, of counsel), for defendant Best.

Sheehan & Collin, for defendants Brooklyn Heights Railroad Company and Bridge Operating Company.

William N. Dykman, for defendant Coney Island & Brooklyn Railroad Company.

Paul D. Cravath, Henry A. Robinson, and Chase Mellen, for defendant New York City Railway Company.

15

MADDOX, J.   The great and immediate need of the traveling public for reasonable railroad transit and traffic facilities over the Williamsburgh bridge may now be, and for a long time past must have been, fully appreciated, but that can have no consideration or influence in determining this controversy, as to the legality of the contract in question, however pronounced the demand for relief from congested travel conditions and for the full and complete use and enjoyment of that structure as a public thoroughfare may be, and further comment or discussion along that line can serve no good purpose here and is not necessary or material to the solution of the question presented.

This is a taxpayer's action to annul official action — a contract for the operation of street surface cars over the Williamsburgh bridge — as an illegal act, because of want of power in the municipal officer, and also to restrain the carrying out of the terms of such contract.   The sufficiency of the complaint is attacked by demurrer, and all facts alleged, and also such as are fairly inferable from those stated, must be deemed to be admitted, though the demurrant is not bound by or to be held as admitting conclusions of law.   A careful reading of the complaint fails to disclose any allegation of fraud, collusion, or bad faith on the part of the officer in so contracting, and the controversy is one of legal authority only, so the sole question is one of power. Had the bridge commissioner statutory power and authority to make the contract set forth in, and a copy of which is annexed to, the complaint?   He then had, and now has, only such powers and authority as were and are conferred upon and delegated to him by statute, and if there be wanting statutory authority to make such contract, or if the contract would create and confer a franchise, then the complaint must be held to be sufficient; otherwise the demurrer must be sustained.

The Legislature, representing the sovereign power, the people of the State, was and is under no constitutional restriction in " providing for building bridges, and chartering companies for such purposes, * * * on the East river." Const. art. 3, § 18.   It had full power to provide for and to

regulate the construction, control, care, management, and operation of the Williamsburgh bridge, and it could confer and delegate its powers in that regard to a corporation, to a commission, either State or municipal in character, to State, county, or municipal officers, or to a municipality. By chapter 789 (p. 1687) of the Laws of 1895, amended by chapter 612 (p. 732), of the Laws of 1896, the construction of the Williamsburgh bridge over the East river was authorized. It was to be constructed by commissioners to be named as in said act provided (§§ 1, 3), and upon completion was to be " a public highway   *   *   *   between the cities of New York and Brooklyn,   *   *   *   and the care, management, and control thereof shall be vested in the said commissioners and their successors, who shall possess in relation thereto like powers as are   *   *   *   vested in the trustees of the New York and Brooklyn bridge in relation to " that " bridge, unless the legislature shall otherwise provide therefor." § 7 as amd. by Laws of 1896, p. 734, chap. 612. At the time, among the powers of the trustees of the New York and Brooklyn bridge was that to " operate and authorize to be operated, a railroad or railroads over said bridge, and fix the fare to be paid by any passenger on any railroad operated by them " (Laws of 1875, p. 293, chap. 300, § 7; Laws of 1882, p. 480, chap. 410, § 1980); and this, we see, was one of the " like powers " which by the provision of the Act of 1895, as amended in 1896 (p. 732, chap. 612), the commissioners of the new bridge and their successors " shall possess in relation thereto."

It will be noticed that, as originally contemplated by the Act of 1895 (p. 1687, chap. 789), the commissioners were to take possession of the " real estate or interest therein " acquired by them for bridge purposes " in the joint name of the city of New York and the city of Brooklyn," but that " the title to all such real estate or interest therein shall be taken to and in the name of the trustees of the New York and Brooklyn bridge " (§ 3); that upon completion of said bridge the commissioners were to file their final report and all their records and papers in the office of such trustees,

and that " the care, management and control " of said bridge " shall be vested in the trustees of the New York and Brooklyn Bridge, who shall possess in relation thereto like powers as are vested in them in relation to said New York and Brooklyn bridge." § 7. Thus is made plain the legislative intent to assimilate the detail of " the care, management and control ". of the new bridge to that of the old, the New York and Brooklyn bridge, which had then for some years been open and in use for pedestrian, vehicular, and railroad travel. By the Act of 1896 (p. 732, chap. 612), some changes were introduced, but not as to the manner of " the care, management and control " of the new bridge, for we see that the title to real estate or interest therein acquired by the commissioners shall " be taken to and in the corporate names of the cities of New York and Brooklyn as joint tenants " (§ 3, as amd.), instead of to and in the name of the trustees of the old bridge, and that upon the completion of the bridge the final report shall be filed in the office of the comptroller of the city of New York, a copy thereof in the office of the comptroller of the city of Brooklyn, and that " the care, management and control " of said bridge " shall be vested in the said commissioners and their successors," instead of said trustees, but possessed of all the powers of the trustees of the old bridge in relation thereto, at the time of the passage of that act. (§ 7, as amd.)

It is a rule of statutory construction that the whole of a statute must be considered in interpreting and construing the language used and in giving effect thereto. In complying with the rule just stated, we find a significant expression in the fifth section of the Act of 1895, and its use in that section, and immediately following, a provision for the possible acquisition or extinguishment of an existing right in a corporation to operate a railroad over a contemplated bridge, would seemingly emphasize a grant of the power claimed by the demurrant in the act under consideration. As has been shown, the commissioners of the new bridge were vested with like powers as the trustees of the old bridge, which included the right to operate, or to authorize the operation of, a railroad or railroads on the bridge and fix the passenger

fare therefor. They were, it is true, municipal officers
(People ex rel. Baird v. Nixon, 158 N. Y. 228), but they
derived "their powers, duties and authority  *  *.  *
from the special act of the legislature which provided for
the construction of the bridge." Knowles v. City of New
York, 176 N. Y. 435. Now, by section 5 of that act, the
commissioners were, upon proper consent being obtained,
authorized to purchase from a corporation having a valid
charter, with authority to construct a bridge such as was
contemplated by that act, "said charter and all the rights
and powers granted thereby," and by such purchase "to
take or extinguish any existing right of such corpora-
tion to operate any railroad across said bridge;" and im-
mediately following this provision for the possible ex-
tinguishment of the right in a domestic private corpora-
tion to operate a railroad over such bridge we have
the provision to which I have alluded, which is: "But
nothing in this act contained shall prevent said commission-
ers in their discretion from contracting with any corpora-
tion to operate a railroad across said bridge if said com-
missioners shall determine it to be in the public interest."

If the commissioners did not have the authority to operate,
or to authorize the operation of, a railroad thereon, why
declare that nothing in that "act contained shall prevent"
their "contracting with any corporation to operate a rail-
road across said bridge"? But they had such right (Laws
of 1895, p. 1691, chap. 789, § 7; Laws of 1896, p. 732,
chap. 612; Laws of 1875, p. 293, chap. 300, § 7; Laws of
1882, p. 480, chap. 410, § 1980); and, further, in the event
of the acquisition by them of the charter of a corporation
having authority to construct a like bridge, together with
an existing right to operate a railroad thereon, then that
the extinguishment of such existing right to operate said rail-
road shall not prevent a contract between the commissioners
and any corporation for the operation of a railroad on said
bridge when constructed; in other words, that the extinguish-
ment of the then existing right in a corporation shall not
be deemed an inhibition against the future operation of a
railroad on said bridge. Can it be seriously contended that

the commissioners, had they remained in the " care, management and control " of the bridge, possessed of " like powers as " were, at the time of the passage of the Act of 1896, " vested in the trustees of the New York and Brooklyn Bridge in relation " thereto, and with the statutory declaration that nothing in the act providing for the creation of the commission shall prevent them from so contracting, would not have had power to " operate or authorize to be operated a railroad or railroads over said bridge and fix the fare to be paid by any passenger " ?  I think not, and am of the opinion that the words " authorize to be operated " are sufficient to imply and comprehend a contract to operate. The power and authority to operate or to contract for the operation of a railroad is ample, for to conclude otherwise we must hold the language in that regard of section 7 of chapter 789 of the Act of 1895, as amended, is meaningless; and this we should not do (End. Interp. Stat., § 23) if effect can be given to the language of the statute as a whole. As Judge Brown says in Gordon v. Strong, 3 App. Div. 400, decided about a month before the enactment of the amendment of 1896:  " Section 5 of the law authorizing the construction of the bridge (Laws of 1895, p. 1687, chap. 789) grants to the commissioners the power to contract with any corporation to operate a railroad across said bridge if they shall determine that to be in the public interest."

Thus the law as to care, management, and control of the bridge in question stood until the revised and amended charter of the city of New York was enacted in 1901 (see p. 1, chap. 466), when the Williamsburgh Bridge commission, created by chapter 789, p. 1687, of the Laws of 1895, was " abolished, and all its powers and duties are devolved upon the commissioner of bridges of the city of New York." P. 252, § 595, subd. 5.  Among the powers so devolved upon the bridge commissioner, unless it was inconsistent with other provisions of the charter or repealed by implication, was " to operate and authorize to be operated a railroad or railroads over said bridge, and fix the fare to be paid by any passenger or any railroad operated by " him, for, as we have seen, this was one of the powers of the trustees of the

New York and Brooklyn Bridge (Laws of 1875, p. 293, chap. 300, § 7; Laws of 1882, p. 480, chap. 410, § 1980), conferred upon the commissioners of the Williamsburgh Bridge. (Laws of 1895, p. 1691, chap. 789, § 7, as amd. by Laws of 1896, p. 734, chap. 612). With the creation of the " Greater City of New York " (Laws of 1897, p. 1, chap. 378), and the absorption of the city of Brooklyn, came new officers, new rights and obligations. By devolution of title the city of New York became the sole owner of the two bridges hereinbefore referred to, and the management and maintenance of the New York and Brooklyn Bridge and the operation of the railroad thereon devolved upon the commissioner of bridges immediately upon his appointment and qualification. He also had " cognizance and control * * * of the construction, repair, maintenance, and management " of all other bridges within the territory of the city, not included in public parks, " except the East River Bridge, authorized by chapter seven hundred and eighty-nine, laws of eighteen hundred and ninety-five." P. 209, § 595. The East River Bridge is now known, and has been referred to by me, as the " Williamsburgh Bridge." The offices of the trustees of the New York and Brooklyn Bridge were abolished, and all their powers and duties, so far as consistent with and conformable to the provisions of the charter, were " devolved upon the commissioner of bridges * * * and upon the municipal assembly." P. 210, § 601.

We now come to the revised and amended charter of 1901 (p. 1, chap. 466), wherein we see there is no change in language as to the jurisdiction, cognizance, control, powers, and duties of the bridge commissioner as to the New York and Brooklyn Bridge, and that the only change in section 601 (p. 254) is the substitution of the board of aldermen for the municipal assembly. The provision as to the abolition of the Williamsburgh Bridge commission and the devolution of all its powers on the bridge commissioner (p. 252, § 595, subd. 5) has been given above. It is unnecessary to discuss the provisions of chapter 663 of the Laws of 1897, since good reason for that enactment is made plain in the dissenting opinion of Mr. Justice Van Brunt in Hearst v.

Berri, 24 App. Div. 80, wherein he writes that by the provisions of the Laws of 1897 (p. 210, chap. 378, § 598), passed prior to chapter 667 (p. 913), "the passageway of the bridge now set apart for foot passengers shall remain free and open to all pedestrians coming or going at all times;" and we see that the contract contemplated by that statute (p. 903, chap. 663) would provide for the running of street surface cars over the bridge and across said passageway for pedestrians' travel, thereby interfering very materially with the "free and open" use thereof. It would also interfere with the intended use of the roadways for vehicular traffic, since the scheme of that bridge embraced two roadways — a passageway for pedestrian travel, with a bridge railroad on either side of such passageway, and between it and the north and south roadways respectively — and there was no place for such street car transit except on said roadways. That act took away no power or authority which the trustees had, and we may well concede that the right, previously conferred, to "operate and authorize to be operated a railroad or railroads over said bridge," was limited to such operation between the termini thereof.

The contract in question does not create or confer a franchise. If it did, then, as before stated, the contract would be illegal and beyond the power of the municipal officer making it. The bridge in question is by statute declared upon completion to be a "public highway," and such it in fact is. It is a highway within the contemplation of section 45 of the revised and amended charter of 1901, and as such is subject to the operation of all the provisions of sections 44, 45, and 71 to 77 of said charter. The structure includes a bridge railroad, and such was the contemplation of the legislation authorizing its erection and construction. The railroad tracks, loops, and electrical equipment have been laid and installed by the city, are its property, and with the approaches and structures make up and constitute the bridge as completed. The contract under consideration is in effect a traffic agreement for the operation of cars upon said bridge, involving the use of the railroad tracks and electrical equipment thereof, and the connection of the bridge tracks at its

termini with the tracks of the New York and Brooklyn Companies, respectively, the Bridge Operating Company agreeing to pay a stipulated sum per annum for the use of the electrical equipment and to keep the same and the surface tracks in good order and repair, and the defendant companies agreeing to operate cars across the bridge and to pay therefor an agreed price per round trip for each car operated or transported across said bridge. The contract has a period of years to run, but, as with all contracts, it may be terminated for a breach of condition or of covenant, and it must also be deemed to be subject to the continuous operative duty on the part of the commissioner of bridges, and of all who may succeed him in the care, control, and management of said bridge, to make, from time to time as occasion may require, such reasonable rules, regulations, and provisions in relation to the maintenance and operation of said bridge as an entirety " as the public interest or welfare of the city may require." Syracuse Water Co. v. City of Syracuse, 116 N. Y. 167, and cases cited. As said by Chief Judge Cullen, while a member of the Appellate Division, in this Department, in New York Mail & N. T. Co. v. Shea, 30 App. Div. 266, in speaking of a contract made by the bridge commissioner: " If at any time the plans of the authorities in the control of the bridge, made in good faith, require a change,   *   *   * or even a total abrogation of its privilege, the plaintiff must submit."

A vested franchise is undoubtedly a property right. But what franchise is created or conferred by the contract referred to? The defendants are not given any vested right to construct and operate a railroad on or across the bridge. It is simply a privilege, a license, for consideration during the continuance of that contract, to operate cars upon the property of the city, its tracks upon its bridge, for which the companies are to pay " five cents per round trip for each and every car operated or transported " across said bridge. True, there is the right to assign, and the defendant companies may, with the approval of the commissioner, permit other companies operating surface railroads in either Manhattan or Brooklyn to operate their cars over said bridge; but

at the end of the contract period of ten years, or at an earlier termination of said contract if that shall happen, what property or right would either of the contracting companies or any assignee have under that contract in or to the bridge railroad, its tracks or electrical equipment? What franchise would either of the companies then have to construct a road on and to operate its cars across the bridge? I cannot spell out any. Indeed, the holding in Hart v. Mayor, 16 App. Div. 227, is, I think, conclusive as to that. There Judge Williams says: "If * * * the defendant railroad company had no right under its original franchise to construct and operate the road, then it could acquire no right to construct it by or under the resolution in question." And so here, if the defendant companies have no right under their original franchises to construct and operate a road over the bridge, then they do not acquire any such right under or perforce of the contract here in question.

Plaintiff's contention that the grant of power to operate, or to authorize the operation of, a railroad upon said bridge and between its termini, is violative of article 3, section 18, of the Constitution, in that the consents required thereby are wanting, is without force, and is fully answered by the decision in Sun Publishing Assn. v. Mayor, 152 N. Y. 257.

The power or authority of any of the defendant companies to enter into the contract here in question cannot be raised in this action (Starin v. Edson, 112 N. Y. 215), and that question is dismissed without further consideration.

From the foregoing it follows that the contract under consideration does not contravene any of the provisions of sections 44, 45, and 71 to 77 of the city charter, and that it is clearly within the delegated statutory powers of the bridge commissioner.

It is unnecessary to consider the other questions presented, and the conclusion is that the demurrer must be sustained.

Demurrer sustained.