THE CITY OF NEW YORK, Respondent, *v.* BROOKLYN CITY RAILROAD COMPANY, Appellant.   (Appeals Nos. 1 and 2.)

Second Department, November 25, 1921.

**Municipal corporations — city of New York — city does not have power to operate railroad over Williamsburg bridge — certificate of convenience and necessity and permission to cross tracks of street railroad by city railroad must be had from Public Service Commission.**

The city of New York has no legislative power, through its commissioner of plants and structures, to operate a railroad over the Williamsburg bridge.

Assuming that the city has authority to operate a railroad over such bridge, it would require a certificate of convenience and necessity from the Public Service Commission to authorize such operation, and an application by the city for permission to construct an additional track crossing the tracks of defendant railroad and for the determination of the compensation to be paid to the defendant would have to be made to the Public Service Commission.

MILLS and KELLY, JJ., dissent, with opinion.

APPEAL by the defendant, Brooklyn City Railroad Company, from an order of the Supreme Court, made at the Kings Special Term and entered in the office of the clerk of the county of Kings on the 7th day of April, 1921, providing for and appointing three commissioners under section 22 of the Railroad Law to determine the compensation to be paid by

APP. DIV. — VOL. CXCVIII.     47

the plaintiff to the defendant by reason of the construction by the plaintiff of a track crossing the tracks of the defendant on Driggs and Bedford avenues, borough of Brooklyn, city of New York, as well as to determine the line or lines, grade or grades, points and manner of such crossings, and also from an order, entered in the said clerk's office on the 19th day of July, 1921, confirming the amended report of said commissioners.

To meet the doubt whether the first order appointing commissioners was appealable, defendant has appealed from each of these orders.

The city of New York, by Grover A. Whalen, commissioner of plant and structures, presented a petition setting forth an ordinance adopted by the board of aldermen April 27, 1920, approved by the mayor May 3, 1920, declaring that on and after the termination of existing rights, no permit should " be granted to, or contract entered into with, any person or corporation allowing such person to operate cars on the tracks owned by The City of New York over the Williamsburg Bridge and the approaches on the route known as the bridge local service and at present operated by the Bridge Operating Company." That after termination of existing permits, " all passenger or -other transportation service over the said bridge local route shall be operated directly by The City of New York and the Department of Plant and Structures is hereby designated as the agency for the operation of such service."

By section 4 it was provided: " The fare to be charged for passage on the cars operated on the bridge local route shall in no case be fixed at a sum greater than the amount necessary to cover the cost of operation of such service, plus the necessary reserve for sinking funds and depreciation."

In connection with this new service, the commissioner was authorized by resolution adopted by the board of aldermen July 13, 1920, and approved by the mayor July 22, 1920, to provide a car barn on the Brooklyn side, and to connect it by a track from the bridge plaza. Later, by resolutions of July 16, 1920, and September 24, 1920, adopted by the board of estimate and apportionment, the department of plant and structures was authorized to maintain on the Williamsburg

bridge a trolley line to have an estimated minimum duration and usefulness of forty years. The petition showed that such track to such car barn was to cross defendant's tracks on Driggs avenue and Bedford avenue, which pass under the Williamsburg bridge. It also set forth that the existing operation of cars on the Williamsburg bridge was then under temporary permits, the last of which had already expired. The formal averment followed that the parties could not agree upon the compensation to be paid for such track intersection.

The answer contested petitioner's power or authority to operate a railroad upon the Williamsburg bridge, and further alleged that neither the city nor its commissioner of plant and structures had under any law a franchise or right to operate a railroad over such bridge. Defendant further objected that no permission of the Public Service Commission of the State of New York, First District, had been granted, which the Public Service Commissions Law, section 53,* made a condition precedent to the exercise by a common carrier of any franchise or right under any provision of the Railroad Law or of any other law; and further that the city had not heretofore exercised any franchise to operate a railroad on such bridge. Defendant's tariff schedule filed with the Public Service Commission had stated that when the commissioner of plant and structures should commence operation of this local bridge service defendant would have to discontinue operation of through lines, because it could not compete with a city railroad operated at cost, also because of the danger to run a through service over tracks on which the city would operate a local service.

In appointing commissioners the court at Special Term filed an opinion (115 Misc. Rep. 94), which determined that the city could operate this bridge railroad, and held that such power carried with it the right to install connecting trackage to the car barn. Accordingly three commissioners were appointed, who organized, took proofs, and reported; this report was confirmed by the order of July 18, 1921. No question is raised as to the details of such report.

* Since amd. by Laws of 1921, chap. 134, and short title of act changed to Public Service Commission Law. — [REP.

*William N. Dykman,* for the appellant.

*Joseph A. Devery* [*John P. O'Brien, Corporation Counsel,* and *Alex. I. Hahn* with him on the brief], for the respondent.

Putnam, J.:

This appeal raises two questions: *First.* Has the city through its commissioner of plant and structures, power to operate this proposed railroad on the Williamsburg bridge? *Second.* If so, would it require the certificate from the Public Service Commission to authorize such operation?

The charter powers of the commissioner of plant and structures, as they had been conferred on April 27, 1920, are, therefore, to be examined. Under the terms of the Greater New York charter (Laws of 1901, chap. 466, § 595, as amd. by Laws of 1916, chap. 528; since amd. by Laws of 1921, chap. 170), he has no such express power, although he has control of the operation of the railroad on the New York and Brooklyn bridge (the original bridge of 1883). He has also general authority as to construction, repair, maintenance and management of other city bridges which extend across the waters of a navigable stream, or have a terminus in two or more boroughs. Notwithstanding these limitations, in which a specific enumeration of the commissioner's powers are in marked contrast regarding city bridges, the right to operate this Williamsburg bridge railroad is now claimed from powers and franchises conferred upon the commission that erected that bridge, which have descended to and are now vested in the commissioner of plant and structures.

Reverting to the original New York and Brooklyn bridge, the Legislature had then to provide for an organized body to erect a span between two cities, with *termini* in two counties. It conferred broad powers on such trustees of this first bridge. Its trustees were made a *quasi* corporation. They had power to operate a railroad and to contract for such operation. · The Legislature conferred on them a complete franchise not only to operate a railroad, but to fix " the fare to be paid by any passenger on any railroad operated by them." (Laws of 1875, chap. 300, § 7.) In this act, and confirmed in later amendments, such franchise and full *quasi* corporate powers were granted.

In the ensuing thirty years before consolidation, an additional · East River bridge had been projected. But very different powers came to this commission. It was to prepare a plan for building what was later called the Williamsburg bridge. (Laws of 1895, chap. 789.) This commission could purchase and condemn land, but it could not itself take title (§ 3.) Such title was to be in the name of the trustees of the New York and Brooklyn bridge. On completion of the new bridge all the commission's records were not to remain in its archives, but instead were to be filed in the office of the trustees of the New York and Brooklyn bridge; and what seems more striking, after completion, the management and control was also to be vested in these other trustees, who (§ 7) should have in relation thereto " like powers as are vested in them in relation to the said New York and Brooklyn bridge." The restrictions as to any railroad franchise were more strongly negatived. With the consent of the mayors and comptrollers of the respective cities, the commission could purchase charter rights of any existing corporation to construct a bridge, such as the act contemplated, with authority, " and thereby to take or extinguish any existing right of such corporation to operate any railroad across said bridge." (§ 5.) The commissioners were empowered to contract with any corporation to operate a railroad across said bridge; and if necessary, to proceed to acquire such corporate rights and powers through condemnation proceedings.

Obviously such a scheme for this new commission to be humiliated as permanently subordinate to the old trustees of the New York and Brooklyn bridge would work ill in actual practice. So the following year (Laws of 1896, chap. 612) this act was amended. Title to lands acquired was to be in the corporate names of the cities of New York and Brooklyn, as joint tenants. (§ 3, as amd.) Instead of separately correcting all these detailed discriminations of the original act, this was comprehensively done (by amending § 7) in a declaration that the commissioners and their successors, instead of going out of office on completion of the bridge, were to continue in control. The formula used was: " The said bridge shall thereupon be and become a public highway for the purpose of rendering travel * * * safe and certain at all

times, and the care, management and control thereof shall be vested in the said commissioners and their successors, who shall possess in relation thereto like powers as are at the time of the passage of this act vested in the trustees of the New York and Brooklyn bridge   *   *   *,   unless the Legislature shall otherwise provide therefor."

Clearly this was far from conferring a railroad franchise. It was an attempt to redress the unfair discrimination against the new commission and was intended, as for the past score of years it had been always understood, as merely to confer full commission powers as to this newly planned bridge. Long before this bridge was built, city consolidation was accomplished. The city charter of 1897 had a department of bridges. That commissioner was to succeed to the offices and duties of the trustees of the New York and Brooklyn bridge " so far as they are consistent with and conformable to the provisions of this act." (§ 601.) Such commissioner of bridges, with the municipal assembly (changed by chapter 466 of the Laws of 1901 to " board of aldermen "), should " exercise such duties and perform such powers, subject, however, to the provisions, directions and limitations of this act." (Laws of 1897, chap. 378, § 601.)

The other provisions of the original Greater New York charter, to which this devolution of powers was declared to be subject, authorized the new commissioner of bridges to have cognizance and control of the management and maintenance of the New York and Brooklyn bridge, the operation of a railroad and the collection of fares and tolls upon that bridge, and on no other. (§ 595.) The Williamsburg bridge had not been then completed.

On December 19, 1903, the city opened the Williamsburg bridge, and though the Manhattan approaches were incomplete, it became a public highway. In 1916, when the department of plant and structures was created to succeed that of bridges, section 595 of the Greater New York charter was materially amended, but the commissioner's cognizance and control respecting the operation of any railroad was limited to that on the New York and Brooklyn bridge. His power as to the collection of fares and of tolls is expressed as to that bridge only. (Laws of 1916, chap. 528.)

I conclude that the claim of a franchise power over any bridge between two different boroughs in the greater city would be as tenable as to say at this day that such commissioner has unearthed a railroad franchise upon the Williamsburg bridge by reason of general words in the amendment of 1896. There is the further difficulty to suppose that the Legislature's grant to a corporation like the trustees of the New York and Brooklyn bridge was meant in 1896 and 1901 to be transferred to an individual departmental head, such as the former commissioner of bridges, or the present commissioner of plant and structures. No doubt section 601 of the original Greater New York charter did transfer to the commissioner of bridges the power to continue operating a railroad and collecting fares on the New York and Brooklyn bridge. But where was given or transferred any franchise for a railroad on the Williamsburg bridge? It never existed, and was never before asserted. (See *Schinzel* v. *Best,* 45 Misc. Rep. 455; affd., 109 App. Div. 917.) By the charter, the commissioner's powers over bridges other than the New York and Brooklyn bridge, are those of construction, repair, maintenance and management, and this specification by ordinary statutory construction, limits and excludes other bridges. (See *Manhattan Bridge Three-Cent Line* v. *Third Ave. R. Co.,* 154 App. Div. 704.)

In such legislative grants of a right to exact fares, nothing should depend on mere implication. This is on a principle that serves to defeat any purpose concealed in the use of terms not apparent on the face of the act, and requires open dealing with legislative bodies. (12 R. C. L. " Franchises," § 21, p. 194.) As was laid down long ago in grants by the public, nothing passes by implication. (*Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420.)

*Second.* The majority of the court are also of opinion that such an application as is here made requires the approval of the Public Service Commission. It is not alone the additional track, but the more complicated question of the safety and convenience of the public. On any view of the plaintiff's rights, it is not under a legislative command, as was the Hudson Valley railroad, in *Village of Fort Edward* v. *Hudson Valley R. Co.* (192 N. Y. 139).

Second Department, November, 1921.          [Vol. 198

Hence I advise that the orders of the Special Term, both appointing commissioners and confirming their report, be reversed, with ten dollars costs and disbursements to the appellant.

Jaycox, J., concurs; Blackmar, P. J., concurs in a separate opinion; Mills, J., reads for affirmance, with whom Kelly, J., concurs.

Blackmar, P. J.:

I am inclined to agree with Mr. Justice Putnam that the statutes, read together, cannot be construed as vesting in the departmental official known as the commissioner of plant and structures a franchise to operate a railroad over the Williamsburg bridge. By the act authorizing the construction of the Brooklyn bridge, the power to operate and contract for the operation of a railroad over the bridge was given to the trustees of the New York and Brooklyn bridge. This was a *quasi* corporation which held the bridge as trustees for the cities of New York and Brooklyn, and the act, I think, conferred upon these trustees a franchise to operate a railroad over the bridge, which was an extension of a public highway.

The statutes regarding the commissioners of the Williamsburg bridge, in 1895 and 1896, have been cited. The question is whether by these statutes and by the charter of 1897, together with the amendments of 1901 and 1916, the franchise which theretofore was conferred upon the trustees of the New York and Brooklyn bridge was extended to the Williamsburg bridge and vested in the commissioner of plant and structures.

I find it extremely difficult to hold that a franchise conferred upon a *quasi* corporation like the trustees of the New York and Brooklyn bridge was meant to be transferred to an individual departmental official such as the commissioner of plant and structures unless the intent plainly so appeared and even then it might be doubtful.

I can understand how such a franchise might be transferred to the city of New York. Section 601 of the original Greater New York charter (Laws of 1897, chap. 378) provides that upon the appointment of the commissioner of bridges the respective offices of the trustees of the New York and Brooklyn

bridge shall be vacated and the powers and duties which vested in and devolved upon them shall, so far as they are consistent with and conformable to the provisions of the act, devolve upon the commissioner of bridges of the city of New York and upon the municipal assembly. This was a transfer of the power to operate a railroad from the trustees of the New York and Brooklyn bridge to the commissioner of bridges and the municipal assembly, in effect to the city of New York.

As to the Williamsburg bridge I cannot find that there is anything which indicates that this franchise was transferred to the city of New York. The commissioner of plant and structures is simply the head of a department. His duties are prescribed by statute. They are special as to the New York and Brooklyn bridge, but they are duties of operation only; and as to the Williamsburg bridge, by the charter of 1901, his powers over bridges other than the New York and Brooklyn bridge are powers of construction, repair, maintenance and management. The clause in the act quoted, " The board of commissioners established by chapter seven hundred and eighty-nine of the laws of eighteen hundred and ninety-five is hereby abolished, and all its powers and duties are hereby devolved upon the commissioner of plant and structures of the city of New York,"* is, I think, to be read in connection with the general powers granted to the departmental head, which are the powers of construction, repair, maintenance and management.

I also agree that if such power was given to the commissioner of plant and structures it was a general permissive power only, and whether it should be exercised or not depended upon the granting of a certificate of convenience and necessity by the Public Service Commission in view of the facts existing at the time when it was proposed to install a municipally operated railroad.

Mills, J. (dissenting):

The appellant's sole contention here is that the plaintiff, the city, has no right to operate a railroad over the Williamsburg bridge, and, therefore, has not the incidental right to

---

* See Laws of 1916, chap. 528, amdg. Greater New York charter (Laws of 1901, chap. 466), § 595. Since amd. by Laws of 1921, chap. 170.— [Rep.

any such crossing of appellant's tracks. Appellant does not dispute the incidental right if the main one exists; but challenges the existence of the latter. Its such contention is based upon three subsidiary ones, which are as follows: *First.* The plaintiff has no franchise or authority to operate such a railroad; in other words, the statutes applicable to that bridge should not be construed as purporting to grant such authority. *Second.* If those statutes are to be so construed, they should be held unconstitutional as violating section 10 of article 8 of the State Constitution, in that the operation of such a railroad would not be a " city purpose " within the meaning of that constitutional restriction. *Third.* Even if the said statutes should be so construed, and should be upheld as constitutional, the city should be regarded as a common carrier in respect to that operation, and so held subject to section 9 of the Railroad Law, and section 53 of the Public Service Commissions Law;* and the city has not obtained the certificate of convenience and necessity required by the one section or the approval of the Commission required by the other — until it has obtained both it cannot avail itself of such legislative authority, even if that exists.

It appears that the city, before making the initial application herein, did apply to the Public Service Commission for a certificate of convenience and necessity as to the said spur or side track under that section 9; but that its application was refused by the Commission with an opinion which appears in the record. The gist of that opinion is that anyway, for the operation of such a spur to be used merely to reach a storage barn, such a certificate is unnecessary, even if one be necessary for the main operation over the bridge. Therefore, the Commission denied that application without passing upon the merits whether or not such a certificate is needed for the latter purpose. Upon the argument, I understood the learned counsel for the appellant to practically concede the correctness of the view taken by the Commission, at least so far as to admit that, if the respondent be fully authorized to operate the main railroad over the bridge, no

---

* Since amd. by Laws of 1921, chap. 134, and short title of act changed to Public Service Commission Law.— [Rep.

special certificate is needed for the proposed spur. Such appears to have been held in effect in *Brooklyn Heights R. R. Co.* v. *City of Brooklyn* (152 N. Y. 244).

Therefore, the vital questions presented to us for consideration and determination are these three:

*First.* Is there any legislative authority to the city to operate that railroad?

*Second.* If there be such purported authority, is such operation for a " city purpose " in the constitutional sense of that term?

*Third.* For such operation does the city require the said certificate of convenience and necessity, or said approval, or both?

After very careful consideration and full discussion by the sitting members of this court, a majority of them have reached the conclusion that the first of those questions should be answered in the negative, and the third in the affirmative; and that, therefore, the corresponding objections and contentions of appellant must be sustained. I am unable to concur in that view, and as I have concluded that neither of appellant's objections or contentions is well made, I find myself compelled to dissent from the majority opinion and the decision about to be rendered.

As to the first of the questions above stated, the following is the material statutory situation. The construction of the bridge was originally authorized by chapter 789 of the Laws of 1895. That act (§ 7) provided that, after its completion, the bridge should be a public highway, and that the care thereof should be vested in the trustees of the New York and Brooklyn bridge, who should possess in relation to it the same powers as were vested in them in relation to the New York and Brooklyn bridge. At that time the trustees of the last-named bridge, commonly known as the East River bridge, were by statute expressly authorized to operate a railroad over it, namely, " The said trustees * * * may operate and authorize to be operated, a railroad or railroads over said bridge, and fix the fare to be paid by any passenger upon any railroad operated by them." (Laws of 1882, chap. 410, § 1980.) By chapter 612 of the Laws of 1896 the commissioners under the Williamsburg Bridge Act, the one first cited

above, were vested with the care, management and control of the bridge, " who shall possess in relation thereto like powers as are at the time of the passage of this act vested in the trustees of the New York and Brooklyn bridge in relation to the said New York and Brooklyn bridge." (Laws of 1895, chap. 789, § 7, as amd. by Laws of 1896, chap. 612.) This court had held that the power, conferred by the act of 1895 upon the commissioners, to contract with any railroad company to operate a railroad across the bridge must be exercised during the construction period (*Gordon* v. *Strong*, 3 App. Div. 395; 15 id. 519; affd., without opinion, 160 N. Y. 659); and it may be surmised that that amendatory act of 1896 was passed to meet the effect of that decision. Upon and after the creation of Greater New York, the Legislature, by several apt statutes, abolished the said commissioners and the said trustees and invested their powers with reference to the said bridges in the " commissioner of bridges," an official provided by the charter of the greater city. By a later enactment, viz., chapter 528 of the Laws of 1916, the charter was further amended so as to confer upon the " commissioner of plant and structures " all the powers then vested in the " commissioner of bridges." The former official is now assuming to operate a railroad over this, the Williamsburg bridge, which has previously been operated by various railroad corporations under contract with the city authorities or representatives. The validity of those contracts was upheld in several cases. (*Gordon* v. *Strong, supra; Hearst* v. *Berri*, 24 App. Div. 73; affd., *sub nom. Hearst* v. *Shea*, 156 N. Y. 169; *Schinzel* v. *Best*, 45 Misc. Rep. 455; affd., upon opinion of Maddox, J., 109 App. Div. 917.)

Upon the above review it seems to me entirely clear that the city has express purported statutory authority to operate the railroad in question. Therefore, I quite agree with the learned justice at Special Term in his conclusion to that effect.

It is to be noted that section 595 of the present charter, in its provision abolishing the board of commissioners of the Williamsburg bridge, is absolutely broad and not restricted by any proviso as is the corresponding provision in section 601 as to the New York and Brooklyn bridge. The provision

as to the former bridge, in section 595,* is, "and all its powers and duties are hereby devolved upon the commissioner of plant and structures of the city of New York." I recognize, of course, that if the provisions of the section as to the powers and duties of the commissioner of plant and structures expressly excluded the operation of this railroad, that would have to prevail over and limit the general grant or transfer of the powers of the former commissioners; but I find no such express exclusion. By parity of the reasoning of the majority opinion we would, as it seems to me, have to hold that the commissioner of plant and structures now has no power whatever over the railroad upon this bridge, not even to make a contract with the defendant for its operation. If he has the power to make such contract, he has by the same authority and derivation the power to operate. The conclusion of that majority opinion that "Clearly this [meaning that broad devolution upon the named city official of all the powers and duties of the board of commissioners of this bridge] was far from conferring a railroad franchise" seems to me entirely unwarranted, if it be true, as it appears to be, that that board, just before being abolished, had the express statutory power which constituted such a franchise. It had that by express terms, not merely by implication. The subject clause quoted in that opinion from section 601 of the charter is therein expressly limited to the New York and Brooklyn bridge, and not, as the language of that opinion would seem to imply, extended to any other bridge.

As to the second question, which is in substance whether or not the provision of the statutes purporting to grant to the city that authority is constitutional as being to effectuate a city purpose, there appears to be very little direct judicial authority. The decisions above cited expressly hold merely the validity of the purported power to contract with others for the operation of the railroad. The opinion of Mr. Justice MADDOX in *Schinzel* v. *Best* (*supra*), which was adopted by this court in determining the appeal, declared in exact terms that the commissioners did have the power to operate or contract for the operation of a railroad over this bridge.

---

*Since amd. by Laws of 1921, chap. 170.— [REP.

While it is technically true that the expression as to operation was merely a *dictum*, yet the matter was of such great importance that I think it may well be presumed that if this court had doubted the correctness of that part of the opinion at Special Term the justices here would, in their memorandum of decision, have entered a *caveat* to that extent. Our attention is called by the learned counsel for the appellant to the case of *Dilluvio* v. *City of New York* (73 Misc. Rep. 122), wherein our former associate, Mr. Justice Stapleton, at Trial Term held that the city of New York had no authority to operate a railroad over the Queensboro bridge. The reasoning of his opinion, however, is based upon the proposition that as to that bridge no such power was given to the city or to any of its officials by any statute. The fair implication from the trend of the opinion is that, if the learned justice had found such purported power as to that bridge, he would have held it valid.

To my mind the validity of the statutory provision authorizing the city to operate this railroad is fairly within the principle and effect of the decision in *Sun Publishing Assn.* v. *Mayor* (152 N. Y. 257), which upheld the validity of the Rapid Transit Acts in purporting to authorize the city of New York to construct subways and to lease them to railroad corporations for operation, and in certain contingencies to operate them itself. The majority opinion of the Court of Appeals held both that a railroad within the limits of a city is for a " city purpose " within the constitutional sense of that term, and that, although by the acts the city was to devote its credit to raising money for the construction of the subways and subsequently to lease them out to private corporations for periods of not less than thirty-five nor more than fifty years for operation, yet such provision was not to be regarded as a mere attempt to evade the constitutional restriction against a city loaning its money or credit to " any individual, association or corporation." The late Judge O'Brien, with that strong and devoted loyalty to all constitutional restrictions for which he was noted, dissented in one of his characteristic opinions, in which he averred that that provision was a plain attempt to evade that most salutary restriction of the State Constitution, and that it should not be upheld by the court.

It would be useless to say that even at this late day, upon rereading those opinions, the reasoning of the dissenting one seems more convincing than that of the majority. However that may be, the conclusions of the latter must now be regarded as the law governing us. In short, without prosecuting the discussion further, I think that the operation of a railroad across a bridge over a tidal stream which divides a city is quite as much a thing for a city purpose as the maintenance of railroads in the streets of the city.

It may be added that the conclusions thus far reached herein do not conflict with our decision or opinion in *Brooklyn City Railroad Co.* v. *Whalen* (191 App. Div. 737; recently affirmed by the Court of Appeals without opinion, 229 N. Y. 570). In that case we held merely that without express statutory authority the city has no power to operate bus lines, and that no such authority exists. It is at least of passing interest to note that in that case we declined to apply the doctrine of emergency which shortly thereafter we held applicable and controlling in reference to the recent rent legislation. (See *People ex rel. Rayland Realty Co., Inc.,* v. *Fagan,* 194 App. Div. 185; affd., 230 N. Y. 653. See, also, *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170.)

As to the third and last question, whether or not a certificate of convenience and necessity provided for by section 9 of the Railroad Law and of approval according to section 53 of the Public Service Commissions Law must be secured by the city before commencing operation, I conclude that compliance with those statutory provisions is unnecessary, because the Legislature in authorizing the city to operate this particular railroad has itself passed upon those questions as to this railroad. It would indeed be a unique situation if, upon application made to it, the Commission should find the operation of the railroad, which the Legislature, its own creator, has authorized by express enactment, to be neither convenient nor necessary. While there appears to be no decision of the courts passing directly upon the question, this conclusion would seem to be in harmony with the general principle that a direct special enactment governing the subject-matter will prevail over a general enactment. The learned counsel for the respondent relies upon the case of *Village of Fort Edward*

Second Department, November, 1921. [Vol. 198

v. *Hudson Valley R. Co.* (192 N. Y. 139) as authority in favor of the respondent upon this question. That case, however, does not bear directly upon it. The question there directly involved and decided was whether or not it was necessary to obtain the consent of the Public Service Commission under said section 53 of the former Public Service Commissions Law (Laws of 1907, chap. 429) before two connecting railroads could unite in forming the necessary intersections and connections. The reasoning of the opinion there is that, inasmuch as the Legislature had commanded the connections to be made, it had itself, by necessary implication, determined the question of convenience and necessity; and that, therefore, the general provisions of the statutes in that respect did not apply. In an earlier decision (*Matter of Stillwater & M. St. R. Co.,* 171 N. Y. 589) the court had held the connection mandatory, and of course it could hardly consistently hold that its own decision was subject to the approval of the Public Service Commission. I recognize that there may be a substantial difference between that case of a legislative command and this of a mere legislative specific authority. Still the action of the Commission in any event is only to confer or to aid in conferring an authority. Our decision in *Brooklyn City Railroad Co.* v. *Whalen* (*supra*) did not attempt to decide this question. Indeed our opinion (191 App. Div. 744) expressly reserved it in these words: "Whether that requirement [for a certificate of convenience and necessity] would apply to municipal operation is irrelevant to this inquiry." It may moreover be doubted whether or not the terms of said section 9 of the Railroad Law and those of said section 53 of the Public Service Commissions Law apply to a municipal corporation authorized by statute to operate a railroad. Certainly such a municipality is not a "railroad corporation" within that term used in section 53, and it may well be that the term "common carrier" in that section is controlled by its association with the preceding term "no railroad corporation, street railroad corporation (or common carrier)," so as to limit its otherwise broad and general sense to private parties and not to include a municipality. Indeed, I am impressed that that is the correct view of the matter.

Upon the whole, therefore, I conclude that the respondent

does not need either the said certificate or approval as a condition precedent to its operation of the railroad over the bridge.

It may be true, as claimed by the learned counsel for the appellant, that it would be for the greater and better public interest for the city to continue to contract out the operation of that railroad, because in that event the public, by the continuance of the former system of transfers, would secure larger and cheaper facilities of travel; but that is a question of public policy with which we have nothing to do here. It belongs and appeals to the discretion of the Legislature and the city authorities — the one in conferring and the other in exercising the power.

I, therefore, dissent, and vote to affirm each order appealed from, with ten dollars costs and disbursements.

KELLY, J., concurs.

The order of the Special Term confirming the report of the commissioners, dated July 18, 1921, reversed, and with it the order appointing the commissioners, dated April 7, 1921, with ten dollars costs and disbursements; and the motions denied, with ten dollars costs.